**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

---

JAMES DUNCAN,

       *Plaintiff*,

  v.

WASHINGTON METROPOLITAN AREA
TRANSIT AUTHORITY,

       *Defendant*.

Civil Action No. 14-224 (RDM)

---

## MEMORANDUM OPINION

James Duncan worked for 25 years as a detective for the Washington Metropolitan Area

Transit Authority ("WMATA").  In 2011, Duncan claims, he was instructed to stop investigating

a death at the Farragut North Metro station.  On August 13, 2012, over a year later, Duncan was

questioned in connection with an investigation into whether he had falsified information on

unrelated incident reports.  Shortly thereafter, he filed a complaint with WMATA's inspector

general regarding the 2011 investigation, alleging that he had been instructed to "cover up" a

potential homicide.  Ten days later, after having been formally told he was under investigation

and having been stripped of his badge and gun, Duncan retired.  He then brought an

administrative claim under the National Transit Systems Security Act of 2007 ("NTSSA"),

alleging that he had been retaliated against for filing a complaint with the inspector general.

When the Department of Labor ("DOL") failed to act on Duncan's retaliation claim in a timely

manner, Duncan brought this suit, raising the same allegation.  The matter is before the Court on

WMATA's motion for summary judgment.  Dkt. 15.  For the following reasons, the Court will

grant WMATA's motion.

# I. BACKGROUND

## A.    Background and 2011 Investigation

James Duncan worked for approximately 25 years as a detective for WMATA's Metro

Transit Police Department ("MTPD").  Dkt. 15-1 at 1 (Def.'s Mot. Summ. J. ("MSJ"), Ex. 1, at

1).  On January 15, 2011, Duncan was assigned to investigate a death reported at the Farragut

North Metro station.  *Id.*  According to an affidavit submitted by Duncan's partner, Alanna

Watkins, a Metro customer had noticed a body lying on the tracks.  Dkt. 18-1 at 8 (Pl.'s Opp.,

Ex. 2, ¶ 4) ("Watkins Aff.").  By identifying the decedent and determining the time he had

entered the Metrorail system, Duncan and Watkins were able to obtain digital video of the time

period between the decedent's exit from the last passenger Metro train (around 3 a.m.) and the

discovery of his body.  *Id.* (Watkins Aff. ¶¶ 5–6).  On viewing the video, the detectives noticed

that the decedent had left the train accompanied by a second person.  *Id.* (Watkins Aff. ¶ 6).  One

train operator said that he observed the decedent "help[ing] an intoxicated individual off the

train" at Farragut North.  *Id.* (Watkins Aff. ¶ 7).  The detectives concluded that the decedent had

likely been hit by a train run for WMATA employees.  *Id.* at 8–9 (Watkins Aff. ¶ 10).  The video

appeared to show the second person "behaving oddly" after this train entered Farragut North,

"pacing back and forth and appearing to use a cellular phone."  *Id.* at 9 (Watkins Aff. ¶ 14).  But

the video quality was too low to identify the second person.  *Id.* (Watkins Aff. ¶ 13).

Duncan and Watkins sought to continue the investigation.  *Id.* at 8 (Watkins Aff. ¶¶ 8–9).

But their supervisors denied permission, stating that they were "concerned about overtime costs."

*Id.* (Watkins Aff. ¶ 9).  Watkins sent the video clips to the U.S. Secret Service for enhancement,

but their efforts were unsuccessful.  *Id.* at 9 (Watkins Aff. ¶ 16).  Watkins and Duncan reached

out to the U.S. Attorney's Office for the District of Columbia to see if there was anything else

they could do, but they were told the death would be deemed an accident or suicide absent clear evidence of homicide. *Id.* (Watkins Aff. ¶ 15); *see* Dkt. 15-3 at 2 (Def.'s MSJ, Ex. 3, at 9) ("Investigation Report").  In May 2011, at the behest of the decedent's family, several family members viewed portions of the video clips.  *See* Dkt. 18-1 at 9 (Watkins Aff. ¶ 17); *see also id.* at 12, 15 (Pl.'s Opp., Ex. 3) (affidavits of decedent's relatives).  The family members attested that the images on the clips were "far away and vague," Dkt. 18-1 at 12 (Pl.'s Opp, Ex. 3), and Duncan contends that the video was altered, *see* Dkt. 18 at 10.  It does not appear that the family members were shown the part of the tapes that captured the second person "pacing back and forth."  Dkt. 18-1 at 9 (Watkins Aff. ¶ 17).

## B.    2012 Investigation and Resignation

The present action arises out of a routine review of WMATA investigative matters in the summer of 2012.  According to WMATA, on or about June 12, 2012, WMATA officer Vernon Clayton reviewed a case that Duncan had submitted for suspension. Dkt. 15-5 at 1 (Def.'s MSJ, Ex. 5, at 1) ("Clayton Memo").  Clayton asserts that, upon reviewing the file, he noticed that it bore certain similarities to a case assigned to another officer, and he asked that officer to follow up with the victim in Duncan's case.  *Id.*  When the second officer contacted the victim, she told him that—contrary to what Duncan had written in his incident report—she had never spoken to Duncan or any other WMATA detective.  *Id.*  In response to this discrepancy, Kevin Gaddis, who at the time was responsible for investigating police misconduct as the head of the MTPD's Office of Professional Responsibility and Investigations ("OPRI"), directed Clayton and several other officers to audit Duncan's prior incident reports.  Dkt. 15-8 at 1–2 (Def.'s MSJ, Ex. 8, ¶¶ 1, 3–4) ("Gaddis Aff.").  According to Gaddis, the officers under his direction contacted 100

victims purportedly contacted by Duncan in prior investigations; of those witnesses, ten stated that they had never been contacted by Duncan. *Id.* at 2 (Gaddis Aff. ¶ 5).

On August 13, 2012, Gaddis asked Duncan to meet with him in his office. Gaddis says that he "questioned [Duncan] on his understanding of the procedures of writing and completing [incident reports]," *id.* (Gaddis Aff. ¶ 6); *see* Dkt. 15 at 20 (Def.'s Statement of Material Facts ¶ 17), and Duncan does not dispute that characterization of the meeting, *see* Dkt. 18 at 25 (Pl.'s Statement of Material Facts ¶ 17). In an affidavit submitted to the DOL, Gaddis also stated that Duncan specifically discussed the manner in which he contacted victims in the incident reports that he prepared. *See* Dkt. 18-1 at 38 (Pl.'s Opp, Ex. 11, ¶ 9); *see also id.* at 57 (Pl.'s Opp., Ex. 16, at 1) (Duncan stating that he was "instructed by Captain Gaddis . . . that they were making inquiries on the method of [preparing incident reports]"). Shortly after his meeting with Gaddis, Duncan went to WMATA's Office of Inspector General ("OIG"), where he reported that he had been told to "cover up" a potential homicide in early 2011. Dkt. 18-1 at 24 (Pl.'s Opp, Ex. 6, at 4). The timing of this meeting is not clear from the record. Duncan claims that he met with an OIG employee on August 13, 2012, the same day as his first meeting with Gaddis. *Id.*; Dkt. 15-2 at 5; Compl. ¶ 47. An affidavit submitted to the DOL by an OIG official, however, states that this meeting did not occur until August 15, 2012, after the events described below had already taken place. Dkt. 18-1 at 28 (Pl.'s Opp., Ex. 7, ¶ 4); *see also id.* at 21 (Pl.'s Opp., Ex. 5). In any event, the parties agree that the meeting took place *after* Duncan's first meeting with Gaddis.

Gaddis officially informed Duncan on August 14, 2012, that WMATA was investigating him for falsifying incident reports. *See* Dkt. 15-8 at 2 (Gaddis Aff. ¶ 8). On August 21, 2012, Gaddis met with Duncan again, and, at that time, he informed Duncan that he had identified ten cases in which Duncan appeared to have falsified statements in incident reports. *See id.* (Gaddis

Aff. ¶ 9).  During this meeting, at Gaddis's direction, Clayton confiscated Duncan's gun, badge,

and official credentials, which Gaddis attests is "the standard procedure for a serious misconduct

investigation."  *Id.* at 2–3 (Gaddis Aff. ¶ 10).  Duncan emailed the acting chief of the MTPD to

submit his resignation the following day.  *See* Dkt. 15-7 at 1 (Def.'s MSJ, Ex. 7).  He submitted a

formal resignation letter on August 24, 2012.  *Id.*

## C.      Prior Proceedings

On January 2, 2013, Duncan, then represented by counsel, submitted a complaint to DOL

under the NTSSA.  *See* Dkt. 15-1 at 1 (D's MSJ, Ex. 3, at 1). Duncan argued that he had been the

subject of unlawful retaliation.  *Id.*  He claimed that he had "voice[d] concerns regarding a cover-

up of a homicide to his supervisors and the [OIG]," and, in turn, had been "forced to retire."  *Id.*

Because DOL did not issue a final decision on Duncan's complaint within 210 days, *see* 6 U.S.C.

§ 1142(c)(7), he filed this action on February 17, 2014, raising substantially the same claims.

Dkt.1 (Compl.).  In May 2014, DOL finally issued a decision regarding Duncan's complaint.

Dkt. 15-1 (Def.'s MSJ, Ex. 1).  It concluded that (1) Duncan had not engaged in protected

activity under the NTSSA, because he should have reported the alleged cover-up to the FBI or

the U.S. Attorney's Office, rather than WMATA; and (2) Duncan had not suffered an adverse

employment action, because he voluntarily resigned from WMATA.  *Id.* at 3 (Def.'s MSJ, Ex. 1,

at 3).

This matter is before the Court on WMATA's motion for summary judgment.  Dkt. 15.

In April and May 2015, shortly after WMATA filed its motion, Duncan's attorneys applied for

and were granted permission to withdraw, leaving Duncan to proceed *pro se* in this matter.  Apr.

30, 2015 Minute Order; May 18, 2015 Minute Order.  Although the Court granted Duncan a 60-

day period in which to obtain new counsel, Duncan did not do so, instead filing his opposition *pro se*. Dkts. 17–18.  WMATA's motion is now fully briefed.

## II. LEGAL STANDARD

This matter is before the Court on WMATA's motion for summary judgment.  Summary judgment is appropriately granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a); *see Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986); *Holcomb v. Powell*, 433 F.3d 889, 895–96 (D.C. Cir. 2006).  A fact is "material" if it is capable of affecting the outcome of the litigation.  *Holcomb*, 433 F.3d at 895; *Liberty Lobby*, 477 U.S. at 248.  A dispute is "genuine" if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.  *See Scott v. Harris*, 550 U.S. 372, 380 (2007); *Liberty Lobby*, 477 U.S. at 248; *Holcomb*, 433 F.3d at 895.  "A party asserting that a fact cannot be or is genuinely disputed must support the assertion by . . . citing to particular parts of materials in the record . . . ."  Fed. R. Civ. P. 56(c)(1)(A).

The party seeking summary judgment "bears the heavy burden of establishing that the merits of his case are so clear that expedited action is justified."  *See Taxpayers Watchdog, Inc. v. Stanley*, 819 F.2d 294, 297 (D.C. Cir. 1987).  When a motion for summary judgment is under consideration, "the evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor."  *Liberty Lobby*, 477 U.S. at 255; *see also Mastro v. Pepco*, 447 F.3d 843, 850 (D.C. Cir. 2006).  The non-movant's opposition, however, must consist of more than mere unsupported allegations or denials and must be supported by affidavits, declarations, or other competent evidence, setting forth specific facts showing that there is a genuine issue for trial.  Fed. R. Civ. P. 56(e); *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986).  The non-movant must provide evidence that would permit a reasonable jury to find in its favor.  *See Laningham v.*

6

*United States Navy*, 813 F.2d 1236, 1241 (D.C. Cir. 1987).  If his evidence is "merely colorable"

or "not significantly probative," summary judgment may be granted.  *Liberty Lobby*, 477 U.S. at

249–50.

### III.  DISCUSSION

Congress enacted the NTSSA as part of a 2007 effort to implement the recommendations

of the National Commission on Terrorist Attacks Upon the United States, also known as the 9/11

Commission.  *See* Pub. L. No. 110-53, tit. XIV, 121 Stat. 266, 400 (2007).  One provision of the

statute makes it unlawful for "[a] public transportation agency" to "discharge, demote, suspend,

reprimand, or in any other way discriminate against an employee" on the basis of certain conduct

defined in the statute.  6 U.S.C. § 1142(a).  Such conduct includes, but is not limited to, making a

report "regarding any conduct which the employee reasonably believes constitutes a violation of

any Federal law, rule, or regulation relating to public transportation safety or security," as long as

the report is made to "a Federal, State, or local regulatory or law enforcement agency (including

an office of the Inspector General . . . )," or other responsible entity.  *Id.* § 1142(a)(1).  The

purpose of this provision is to "protect [public transit] employees from adverse employment

impacts due to whistleblower activities related to rail security."  *See* H.R. Rep. No. 110-259, at

348 (2007), *as reprinted in* 2007 U.S.C.C.A.N. 119, 180.

There are no reported opinions interpreting § 1142's anti-retaliation provisions, and the

parties provide only minimal briefing regarding the framework that governs a complaint brought

under the statute.  But DOL has promulgated regulations that define the standards for making a

*prima facie* showing under the Act.  *See* 29 C.F.R. § 1982.104(e).  Under the DOL regulations, a

complainant must show that (1) he "engaged in a protected activity," (2) his employer "knew or

suspected . . . that [he] engaged in the protected activity," (3) he suffered an adverse action, and

7

(4) "[t]he circumstances were sufficient to raise the inference that the protected activity . . . was a contributing factor in the adverse action." *Id.* § 1982.104(e)(2). If the complainant makes this showing, the burden shifts to his employer to "demonstrate[] by clear and convincing evidence that it would have taken the same adverse action in the absence of the complainant's protected activity." *Id.* § 1982.104(e)(4); *see also Araujo v. N.J. Transit Rail Operations, Inc.*, 708 F.3d 152, 157–58 (3d Cir. 2013) (applying this standard in a Federal Rail Safety Act case).

WMATA argues that it is entitled to summary judgment for two reasons. First, it argues, Duncan cannot make out a *prima facie* case of retaliation in violation of the NTSSA because his report to the OIG was not a "protected activity." Second, it argues, even if Duncan's report to the OIG was a protected activity, no reasonable jury could conclude that he suffered any adverse action as a result of having made the report, rather than as a result of Gaddis's investigation into his falsification of incident reports. Because the Court agrees with the second argument, it has no need to reach the first.[1]

---

[1]  WMATA gestures at, but does not fully advance, a third argument: that Duncan cannot make a *prima facie* showing of retaliation because he did not suffer any adverse employment action at all. *See* Dkt. 15 at 16 ("If . . . WMATA took any adverse action against Plaintiff, as opposed to Plaintiff's voluntary resignation, then WMATA would have had legitimate business reasons for any such action . . . ."); Dkt. 20 at 5–6 (arguing that Duncan "cannot have suffered a constructive discharge" in the 24-hour period between his third meeting with Gaddis and the day he submitted his resignation). The Court agrees that it is not clear, on this record, whether Duncan viewed the August 21, 2012 confiscation of his badge and gun as an adverse employment action or whether, instead, he means to press a constructive-discharge theory of his resignation. *See* Compl. ¶¶ 63–73; *cf. Pa. State Police v. Suders*, 542 U.S. 129, 141 (2004) (setting out the legal standard for constructive-discharge claims). Nor is it clear that either the confiscation or D resignation would constitute adverse employment action under the NTSSA. *See* 6 U.S.C. § 1142(a). But because WMATA makes this claim only as a minor premise to its argument that whatever adverse action Duncan may have suffered was not the result of any protected activity, and because the Court agrees with this latter argument, there is no need to resolve the question, and the Court will assume without deciding that Duncan suffered some adverse action.

It is clear from the record that Duncan's complaint to the OIG was not "a contributing factor" to any adverse action Duncan may have suffered.  According to Clayton and Gaddis, the investigation into the falsified incident reports began in June 2012, two months before Duncan approached the OIG to report the alleged cover-up.  *See* Dkt. 15-5 at 1 (Clayton Memo at 1); Dkt. 15-8 at 2 (Gaddis Aff. ¶ 3).  There is no dispute, moreover, that Gaddis first met with Duncan on August 12, 2012, and that Gaddis asked Duncan "whether he knew how to complete" an incident report.  *See* Dkt. 15 at 20 (Def.'s Statement of Material Facts ¶ 17); *see also* Dkt. 15-8 at 2 (Gaddis Aff. ¶ 6); Dkt. 18 at 25 (Pl.'s Statement of Material Facts ¶ 17).  And Gaddis has filed an affidavit stating that he did not become aware of Duncan's report to the OIG "until months after [Duncan] had already resigned."  Dkt. 15-8 at 2 (Gaddis Aff. ¶ 7).  In other words, even assuming that (1) Duncan's report to the OIG was protected activity under the NTSSA and (2) either the confiscation of his badge and gun or his resignation could qualify as an "adverse action," the evidence in the record shows that there was no causal connection between Duncan's report to the OIG (which did not occur until *after* his August 12 meeting with Gaddis) and the investigation into his falsified reports (which began months *before* that meeting).  *See Clark Cty. Sch. Dist. v. Breeden*, 532 U.S. 268, 272 (2001) (per curiam) ("Employers need not suspend previously planned [adverse actions] upon discovering that a . . . suit has been filed, and their proceeding along lines previously contemplated, though not yet definitively determined, is no evidence whatever of causality."); *see also Duncan v. WMATA*, 425 F. Supp. 2d 121, 127–28 (D.D.C. 2006).

In response, Duncan attempts to tell a fundamentally different story.  Although Duncan concedes that he did not meet with the OIG until after his August 13, 2012 meeting with Gaddis, he states that he was not told he was under investigation until August 14, 2012—the day *after* he

met with the OIG.  Duncan thus suggests that the OIG official with whom he met "reported [his] complaint" to Gaddis on August 13, prompting Gaddis to "place[] [him] under investigation" on August 14.  Dkt. 18 at 10.  But Duncan points to no evidence in the record to rebut WMATA's substantial showing that its investigation began months before Duncan met the OIG.  Indeed, Duncan concedes that he met with Gaddis *before* meeting with the OIG.  Dkt. 15-2 at 5 (Pl.'s Resp. to Def.'s Interrog.).  Although WMATA acknowledges that Gaddis did not explicitly tell Duncan that he was under investigation on August 13, it is hard to imagine what other inference Duncan could have drawn from questions from the head of the MTPD's internal affairs office about how he completed his incident reports.  And even if Duncan was still in the dark about the investigation when he went to the OIG, Duncan does not dispute that Gaddis *in fact* had begun his investigation into Duncan's incident reports well before Duncan brought his complaint.  Dkt. 18 at 9–10.  Duncan hypothesizes that Gaddis and other WMATA officers might have invented the charges as an excuse to justify terminating him, *see id.* at 13, 18, but that allegation cannot be squared with the undisputed evidence that they were already investigating the charges—and had approached Duncan about them—before he engaged in any protected conduct.

This timeline is dispositive.  In order to survive summary judgment, a plaintiff alleging retaliation must be able point to evidence of "a causal connection between [his] protected activit[y]" and his employer's allegedly retaliatory action, and thus an employer is not required to suspend any planned or initiated adverse actions upon discovering that an employee has engaged in protected activity.  *See Clark Cty.*, 532 U.S. at 272.  Here, based on the evidence in the record, no reasonable jury could doubt that Duncan was subject to investigation before he complained to the OIG, and therefore any adverse action he suffered cannot have been the result of that complaint.

The sole piece of evidence that Duncan proffers that casts any doubt on this conclusion is an affidavit executed by one of Duncan's prior supervisors, Donald Proctor, Jr.  *See* Dkt. 18-1 at 49 (Pl.'s Opp, Ex. 14).  In that affidavit, Proctor asserts that at some point "[i]n August of 2012, [he] overheard a conversation" between Clayton and another officer about an investigation into Duncan's misconduct.  *Id.*  Proctor attests that he asked Clayton and the other officer about the investigation and that they responded by telling him that OPRI was investigating Duncan "because he submitted a complaint to [the OIG] with concerns" about the department.  *Id.*  In the ordinary course, this evidence might be sufficient to create a genuine issue of material fact about whether the OPRI investigation was brought in retaliation for Duncan's protected activity.  Here, however, it is simply not possible to reconcile such a claim with the *undisputed* fact that Gaddis met with Duncan regarding the OPRI investigation before Duncan's complaint to the OIG, rather than after that complaint.

Notwithstanding this evidence, it might be possible to posit (although Duncan does not) a scenario in which (1) Gaddis was investigating an unrelated issue regarding incident reports; (2) he sought Duncan's advice, by coincidence, shortly before Duncan went to the OIG to discuss a year-old incident; (3) he shortly learned about Duncan's meeting with the OIG, notwithstanding his testimony in this case denying such knowledge; (4) he immediately conspired with no fewer than three fellow MTPD officers to invent a fictional investigation of Duncan as retaliation for Duncan's OIG meeting; (5) he did all of this knowing that he and his fellow officers would be required to repeatedly testify under oath about these events in connection with Duncan's likely lawsuit; and (6) he was prepared to risk that no one would seek confirmation of his story from any of the over 100 witnesses who were purportedly interviewed as part of his investigation of Duncan.  This scenario is, the Court concedes, not metaphysically impossible.  But the question

on summary judgment is not whether the non-movant's account is logically possible, but instead whether a reasonable jury might accept it.  Here, given the overwhelming evidence that Duncan was subject to investigation months before he engaged in any protected activity, no reasonable jury could conclude that the OPRI investigation was the result of Duncan's OIG complaint—and not the reverse.  "[I]f a motion for summary judgment is to have any office whatever, it is to put an end to . . . frivolous possibilities when they are the only answer."  *Deluca v. Atlantic Refining Co.*, 176 F.2d 421, 423 (2d Cir. 1949) (Learned Hand, J.); *see also Liberty Lobby*, 477 U.S. at 251 ("[J]udges [are not] required to submit a question to a jury merely because some evidence has been introduced by the party having the burden of proof . . . ." (quotation marks omitted)).  Because Duncan cannot make out a *prima facie* case of retaliation under the NTSSA, his claim necessarily fails.[2]

## CONCLUSION

For these reasons, the Court will grant WMATA's motion for summary judgment.  A separate Order will issue.


/s/ Randolph D. Moss
RANDOLPH D. MOSS
United States District Judge

Date:  March 31, 2016

---

[2]  In his opposition, Duncan also advances arguments about various procedural errors made by Gaddis, WMATA, and DOL during the proceedings below.  *See* Dkt. 18 at 16–21.  Among other things, Duncan argues that WMATA violated the terms of the collective bargaining agreement entered into between WMATA and its union, *id.* at 16–17; that the allegations against him were based on impermissible hearsay, *id.* at 19–20; and that WMATA has failed to produce various items he requested in discovery, *id.* at 20.  But Duncan points to no authority for the proposition that such issues are actionable under the NTSSA, and he brings no other claim in his complaint.  *See* Compl. ¶¶ 74–83.  These arguments, whether meritorious or not, have no bearing on this case.